Filed 3/10/26  In re M.G. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.M.,<br><br>Defendant and Appellant. | F089940<br><br>(Super. Ct. No. JD145479-00)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Beth A. Sears, under appointment by the Court of Appeal, for Defendant and Appellant.

Kendra L. Graham, Interim County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

T.M. (mother) appeals from the juvenile court's orders of legal guardianship made at a hearing held pursuant to Welfare and Institutions Code[1] section 366.26 with respect to her now 17-year-old son, M.G. (son). Mother challenges the juvenile court's order denying placement of son with a maternal uncle. She also contends the Kern County Department of Human Services (department) failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) by not asking a paternal relative about son's possible Indian ancestry. We conclude mother does not have standing to challenge the denial of relative placement, but we agree with mother that the department failed in its initial duty of inquiry. Accordingly, we will conditionally reverse and remand for the department to conduct the appropriate ICWA inquiry.

<b>FACTUAL AND PROCEDURAL BACKGROUND[2]</b>

Mother and her then 15-year-old son came to the department's attention in February 2024, when the department received a referral that mother was sexually abusing son. Son was taken into protective custody, and an emergency protective order was granted protecting son from mother.

Mother reported to the social worker investigating the referral that son had type II diabetes, which was treated with pills and insulin injunctions, and his glucose levels needed to be checked. Mother stated son was diagnosed as developmentally delayed when he was a baby, and he had an individualized educational plan at his school, where he was in the ninth grade. Mother reported son's father was K.G. (father), but he passed away two years ago.[3] According to mother, son did not know father and did not have a relationship with him. The social worker asked about father's family and if he had any

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    We summarize only those facts relevant to the issues raised on appeal.

[3]    The department's family finding social worker confirmed that father passed away in March 2022.

2.

Indian heritage, but mother did not know anything about his family as father was adopted.

### *The Dependency Petition and Detention Hearing*

A dependency petition was filed alleging son came within the provisions of section 300, subdivisions (d) (sexual abuse) and (g) (no provision for support). At the detention hearing, mother testified about son's paternity. She identified K.G. as son's father. She had never been married, did not live with father when she became pregnant or during the pregnancy, father never lived with son, and father is not listed on son's birth certificate.[4] Mother stated father was present at son's birth and told family son was his. Mother denied that there were other possible fathers.

Mother denied that anyone in her family claimed to have Native American or Alaskan-Eskimo heritage, was an enrolled member of an Indian tribe, received tribal benefits, or lived on a reservation. The juvenile court asked maternal aunt, who was present at the hearing, whether her responses would be the same as mother's regarding Native American or Alaskan-Eskimo heritage; she answered in the affirmative. The juvenile court detained son from mother and ordered that he have no contact with her as contact would be detrimental.

### *The Jurisdiction and Disposition Hearings*

A contested jurisdictional hearing was held on May 14, 2024. A social study report for the jurisdiction hearing identified father as a biological father.[5] Son, who had speech and learning issues, was in special education classes at his high school and he was a Kern Regional Center client. After receiving testimony and argument, the juvenile

---

[4] A photocopy of son's certified birth certificate was provided, which showed no father was listed.

[5] It does not appear from the record that the juvenile court ever made a finding concerning father's status as either a biological, alleged, or presumed father.

court dismissed the section 300, subdivision (g) allegation without prejudice at the department's request and found the section 300, subdivision (d) allegation true. The disposition hearing was continued to June 13, 2024.

The social study for the disposition hearing identified father as the biological father and stated that he was son's father. Son was placed in a resource family home in Bakersfield. The social study stated that son had no Native American or Alaskan-Eskimo ancestry. The family finding social worker searched numerous databases under the names of father, paternal grandmother, who was deceased, and paternal grandfather for paternal relatives, but was unable to locate any additional relatives. On February 16, 2024, the family finding social worker mailed an "AB 938" letter to paternal grandfather, along with pamphlets entitled " 'Important Information for Relatives Considering Placement of a Child' " and " 'Your Rights,' " and sent the same information to maternal relatives. The department recommended bypass of family reunification services for mother and that a section 366.26 hearing be set.

A supplemental report for the disposition hearing disclosed that a social worker spoke with son on May 10, 2024. Son told the social worker he was seeing his girlfriend at school. He felt comfortable living with the caretaker, but he wanted to be placed with his uncle and aunt and have visits with his cousins.

At the June 13, 2024 disposition hearing, maternal uncle Donald M. (uncle) appeared via telephone. Mother's attorney asked that uncle be evaluated or assessed as son's guardian, stating that he had a bedroom that would be appropriate for son, son had spent time with uncle and his cousins, and uncle did not have any convictions that would prevent him from being a legal guardian. Uncle, who lived in Northern California, had not reached out to the department because he was unsure whom to contact. County counsel stated the social worker spoke with uncle that morning and he had not applied for placement. Uncle confirmed to the juvenile court that his intention was to become son's

4.

guardian. The court told uncle a department representative would contact him on how to apply for placement. Son's attorney stated son would like uncle to be assessed and he also wanted contact with his aunt. The court asked the department to set up a visit with aunt and a virtual visit with uncle. The disposition hearing was continued to July 25, 2024, so uncle could be assessed for guardianship.

A supplemental report for the disposition hearing stated the family finding social worker submitted a resource family approval assessment to Solano County on uncle's behalf on June 14, 2024. Solano County resource family approval provided an update on uncle's application on July 16, 2024. Uncle and his fiancé were enrolled in a preapproval training module scheduled for that week and the next training date would be scheduled after they completed the module. The department social worker spoke with uncle the same day. Uncle stated he had been preparing to care for son as he knew there was a possibility son would end up in his care. Uncle planned on adopting son and was looking into adult facilities for him. Uncle, who stated he would protect son from mother, wanted to have contact with son but had not had any telephone or virtual visits. The department continued to recommend bypass of family reunification services for mother and setting of a section 366.26 hearing.

At the uncontested disposition hearing held on July 25, 2024, mother objected but did not provide any evidence or argument. The juvenile court adjudged son a dependent pursuant to section 300, subdivision (d), removed him from mother's custody, denied mother reunification services pursuant to section 361.5, subdivision (b)(6), and set a section 366.26 hearing for November 20, 2024. The court ordered that the son have no contact with mother, finding it to be detrimental.

***The Events Leading to the Relative Placement and Section 366.26 Hearings***

In a social study prepared for the November 20, 2024 section 366.26 hearing, the department recommended that the juvenile court appoint a legal guardian for son. The

5.

report contained a section on the department's ICWA inquiry efforts, including that mother and maternal aunt denied Indian ancestry. A family finding social worker, who was assigned to conduct ICWA inquiries on February 9, 2024, closed the family finding effort portion of the case on October 31, 2024, after identifying six relatives, five of whom received "AB938 letters." At the time of closure, son was placed in a resource family home and there was no relative application pending. There was not enough information known about father to locate and contact paternal relatives. An attempted contact was made with paternal grandfather, but he did not respond. On November 6, 2024, a social worker submitted a request to the family finding unit asking them to contact any maternal relatives, including maternal uncle, regarding ICWA.

Son was placed in the resource family home on May 9, 2024. Uncle applied for placement on July 23, 2024, but the application was pending as of November 7, 2024. Son's caregiver reported that son was very friendly and childlike—he liked everyone and enjoyed school to be around his friends. Son had a difficult time in school; he was unable to read or write, had difficulty communicating, and he stuttered a lot. The social worker observed that son had a good relationship with his caregiver and the social worker believed son was comfortable in the home and liked it there. Son, who was in the tenth grade, had an individualized educational plan for his intellectual disability and speech and language impairment and was in special education classes. The caregiver was committed to guardianship.

Son visited with uncle via FaceTime occasionally and had an in-person visit with uncle since being in protective custody. The social worker spoke with son on October 29, 2024. Son stated he liked his current placement and living with his caregiver. The social worker was unsure if son had a good understanding of adoption or guardianship, and believed son had difficulty understanding what he was being asked or comprehending certain questions or information. Son, whose diabetes was stable, saw an

6.

endocrinologist at Valley Children's Hospital every three months. He enjoyed going to school and interacting with his friends. He attended an afterschool day care facility through Kern Regional Center. He was childlike for his age and needed constant redirection, prompting, and supervision. The department recommended a plan of guardianship, as son was not considered generally adoptable, but the caregiver was committed to a plan of guardianship.

In a supplemental report, the department provided an update on the ICWA inquiries of maternal relatives. The family finding social worker called maternal great aunt, maternal uncle, and maternal aunt, who all denied Indian ancestry, and unsuccessfully attempted to reach maternal grandmother. The social worker noted there was not enough information known about father to locate and contact paternal relatives.

At the November 20, 2024 hearing, son's attorney asked for a continuance as the attorney had asked the department to consider uncle as the legal guardian. The attorney had spoken with uncle, who said everything was finished on his end and he was advised he needed a home evaluation. Mother's attorney stated she had a text conversation with uncle who remained dedicated and committed to becoming son's legal guardian, and the attorney was informed uncle and his wife had passed the background check and finished the resource family assessment process. The juvenile court granted the request for continuance and continued the hearing to January 7, 2025.

In a supplemental report, the department reported that on December 16, 2024, the adoption social worker, who was checking on the status of uncle's application, learned that a Solano County social worker was attempting to schedule a home assessment and complete interviews and a written report. On January 2, 2025, the adoption social worker learned the assessment would be completed the following week, but there was no timeline for approval.

The report stated that ICWA inquiries had been conducted on all maternal relatives and there was not enough information known about father to locate and contact paternal relatives. Maternal grandmother reported Native American ancestry, stating maternal great-grandmother was West Indian and her family was from the Virgin Islands. The social worker asked the family finding unit to obtain further identifying information about maternal great-grandmother from other maternal relatives. The department continued to recommend appointing the current caregiver as son's legal guardian.

Mother and uncle appeared by phone at the January 7, 2025 hearing. Mother's attorney asked to continue the matter so uncle's home inspection could be completed. The attorney asked the court to either place son with uncle or order the department to go to uncle's home to certify it. Son's attorney agreed with the request. County counsel did not oppose a continuance but did object to the department being ordered to go to uncle's home. Uncle confirmed the home evaluation was scheduled for later that week. The juvenile court granted the request for continuance but denied the request to order the department to assess the home, as it seemed that Solano County dropped the ball. County counsel asked the court "to make an ICWA finding." The court agreed and found there was no reason to know the child is an Indian child. The court continued the hearing to February 20, 2025.

In a supplemental report for the February hearing, the department provided an update on the status of uncle's relative application. The adoption social worker spoke to a Solano County social worker on February 6, 2024, and discussed what she knew of son's background and life with mother. The Solano County social worker asked about son's needs, because certain things came up that uncle was not sure about. The Kern County social worker responded that she spoke with uncle when she first received the case, as did the court intake worker, and explained to him about son's needs.

The Kern County social worker explained son's needs to the Solano County social worker, as she was concerned about the attention son requires and his medical needs. Son is diabetic and requires insulin, and his blood sugar must be checked before breakfast and dinner. The results are set up on the caregiver's phone and go directly to his doctor. Son is on a strict diet and cannot eat a bunch of junk food. Son has special needs and attends an after-school program with Kern Regional Center. Son is very childlike and easily manipulated. While he looked like a regular teen, he talked like a young child. Son needed constant supervision and monitoring, and he could not be left alone at home. Son visited with his aunt and cousins, who live in Bakersfield, over the holidays, and the caregiver let son talk to his biological family and would supervise visits between them. Son had visited uncle maybe twice when uncle was passing through Bakersfield, and uncle would "call here and there."

The family evaluation and written reports were completed by February 14, 2025, and the report was expected to be approved the following week. Mother and uncle appeared by phone at the February 20, 2025 hearing. County counsel asked that the hearing be continued so the report could be received and a child family team meeting held regarding placement. The juvenile court granted the request and continued the hearing to April 8, 2025.

In a supplemental report, the department stated it received a resource family approval certificate for uncle and his spouse from Solano County on March 12, 2025. A staffing was held on March 26, 2025, to discuss possible placement with uncle and his spouse. The department wanted to confirm uncle's long-term commitment to son given his extensive needs, clarify the care arrangement plan for son, as uncle reported working full time, and assess uncle's ability to protect son from mother, as uncle reportedly had frequent contact with mother. A child family team meeting was scheduled for April 7, 2025, to discuss uncle's commitment and a possible placement change.

9.

At the April 8, 2025 hearing, which uncle attended virtually, county counsel requested a continuance, as the child family team meeting was held on April 7, 2025, and it was decided that son would have an extended visit with uncle from April 11 to April 21, 2025. The juvenile court granted the request to continue the section 366.26 hearing to May 1, 2025, and set a relative placement hearing pursuant to section 361.3 for the same date.

In a supplemental report for the May 1, 2025 hearing, the department stated that an action plan was developed at the April 7, 2025 child family team meeting, which included the extended visit. The adoption social worker talked to the caregiver and met with son on April 23, 2025. The caregiver stated that during the extended visit uncle contacted her a few times about son's medication; he accidentally put one of son's medications in the freezer and the machine on son's arm came off. The caregiver noted the machine sometimes came off and she told uncle he could use the other machine that took blood sugar levels. Son mentioned to the caregiver that all he did during the visit was go to work with uncle. The caregiver asked son what he did for Easter, and he said, " '[n]othing.' " Son mentioned that he got to see his grandmother and she was happy. The caregiver did not have any concerns, but she felt son worked with uncle most of the time and did nothing else.

Son told the social worker that they did not do anything for Easter. Son confirmed he saw his grandmother, but he did not see his cousins as they were at school. When asked what he did at his uncle's house, he said they worked, went to the gym, and went home, and denied doing anything else. The social worker asked how he felt about living with uncle and he shrugged his shoulders and "made a face like not really." The social worker asked if son would rather stay with the caregiver and visit uncle or go with uncle and visit the caregiver. Son responded that he wanted to stay with the caregiver. When

asked why, he responded because he would miss his friends and girlfriend. When asked what friends, son mentioned "life house and school."

The social worker again spoke to the caregiver, who noted uncle called about the insulin because they were out until 8:30 in the evening. The caregiver stated that son really did miss his friends from life house, because he spends a lot of time there. The caregiver was willing to allow visits with uncle and family if son were left with her. The caregiver noted son loved school and his friends, whom he would do anything for.

The adoption social worker spoke with uncle on April 24, 2025. Uncle stated the extended visit went well, and they went to work and to the gym. Uncle noted that during the meeting everyone kept saying son was doing well in school, but when he gave son $100, he could not count it.[6] The social worker asked if uncle's wife worked, as it was noted at the child family team meeting that she would be son's primary caregiver. Uncle responded she was not presently working, and she only took jobs when she wanted to work. Uncle stated he could take son to work with him as his schedule was flexible and they were trying to integrate son into his home and their lives.

The social worker asked uncle if there were any issues with son's medications. Uncle noted everything went well, but he accidentally put the insulin or weight loss medication in the freezer. Uncle thought son was able to give himself medication, but he needed to be reminded to take them. The social worker advised uncle that son needed supervision.

The department continued to recommend that the juvenile court appoint the current caregiver as son's legal guardian. The department did not recommend a change of placement because: (1) son had established friendships, as well as established

---

[6]     The social worker noted that son was doing well in his special education classes, and at the child family team meeting they discussed that he had an individualized educational plan.

11.

medical, mental health, and regional center services; (2) he was stable in his current placement; (3) he required a higher level of care and redirection; (4) his caregiver was meeting all his needs and was open to visits with uncle and family; and (5) son wanted to remain in his current placement.

### *The Combined Relative Placement and Section 366.26 Hearing*

At the May 1, 2025 hearing, uncle appeared via video communication. The juvenile court began with the relative placement hearing. Mother's attorney made an offer of proof, which the parties accepted, that uncle would testify: (1) son and uncle's family had an Easter dinner; (2) he and son went shopping and spent about two hours at a guitar store where son expressed interest in learning to play the guitar; (3) uncle delayed his marriage until the resource family assessment process and the home assessment were completed; and (4) son was not able to meet his cousins because of the short notice for the visit and the cousins had other plans.

Mother's attorney argued that uncle was fully aware of the dedication required to be a guardian, which he demonstrated by completing the relative placement process and consistently appearing at the hearings. The attorney believed uncle would be able to provide and assist son with reaching his potential and helping him through life.

Son's attorney acknowledged that son had significant developmental delays, but asserted placement with uncle would be the most permanent and stable plan for son and son deserved to have extended family permanently in his life. The attorney wanted son to stay where he was until the end of the school year and then transition to uncle's home and asked the court not to adopt the department's recommendations but rather exercise its discretion to place son with uncle.

County counsel argued the department's position was for son to remain with the current caregiver, as he had established medical, mental health, and regional center services in the area and was doing very well in the placement. In addition, son wanted to

remain with the caregiver, who was open to continued visits with family. County counsel asserted it was in son's best interest to leave son in his current placement.

In making its ruling, the juvenile court addressed the factors under section 361.3 as follows: (1) mother, uncle, and the whole family supported placement with uncle, while son supported placement with his current caregiver; (2) there was nothing to indicate that uncle did not have good moral character, which weighed in uncle's favor; (3) uncle had a strong commitment to provide legal permanency for son, which weighed in uncle's favor, and while he presumably had a relationship with son since his birth, the strength of that relationship was unknown; (4) it was clear that uncle could provide a home and the necessities of life and a secure and stable environment, but there was not much evidence regarding uncle's insight into son's diabetes diagnoses or the implications of son's intellectual disability, and based on the evidence, the court was not very confident in uncle's level of knowledge on these issues; and (5) uncle's home was safe, as he passed a background check.[7]

Finally, the juvenile court considered son's best interest, which it did not believe weighed in uncle's favor. The court gave significant weight to son's desire to stay with the caregiver. The court also gave great weight to the fact that son was already linked up with services in the area, including the regional center, school, and his friends. Considering the section 361.3 factors and based on the evidence before the court, the court decided not to order placement with uncle. The court did not believe a change of placement was in son's best interest at the time, as he had been in a stable placement since May 9, 2024, and the court was not confident that uncle could meet son's special educational, emotional, and physical needs.

---

[7]    The juvenile court did not give any weight to factors concerning the proximity of the parents to the placement, as the case was not in reunification and there was a no contact order with mother, and the placement of siblings or half-siblings in the home.

13.

Turning to the section 366.26 hearing, which was uncontested, the juvenile court found there was not clear and convincing evidence son was likely to be adopted and ordered guardianship as the permanent plan and appointed the caregiver as son's legal guardian. The juvenile court terminated dependency jurisdiction, while retaining jurisdiction over son pursuant to section 366.4.

## DISCUSSION

### I.     The Relative Placement Order

Mother contends the juvenile court abused its discretion in denying placement with uncle. She argues that the juvenile court erroneously assessed the evidence of uncle's ability to meet son's needs, as there was evidence showing he was able to do so, and there was no evidence that son's services could not be replicated in Solano County. She asserts son's desire to remain with the caretaker was insufficient to support the juvenile court's decision. We conclude she lacks standing to raise this issue on appeal.

### A.     *Appealability*

As a threshold matter, we address the appealability of the order denying uncle's placement request. The notice of appeal, which mother's trial counsel filed on June 5, 2025, stated mother was appealing from the findings and orders of the court made on May 1, 2025. Under the "order appealed from" section of the form, mother marked the boxes for "Section 366.26" and "Appointment of guardian." The notice of appeal contained no reference to the May 1, 2025 order denying uncle's request for placement. The department contends in its respondent's brief that we do not have jurisdiction to review the denial of uncle's placement request because the notice of appeal does not identify that order.

Filing a notice of appeal vests jurisdiction in the appellate court and terminates the jurisdiction of the lower court. (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 666.) A timely and proper notice of appeal is essential to vest the

14.

reviewing court with appellate jurisdiction. (*Associated Lumber & Box Co. v. Superior Court* (1947) 79 Cal.App.2d 577, 581.) Under California Rules of Court, rule 8.405(a)(2),[8] the appellant must file a notice of appeal signed by either the appellant or his or her attorney. (*In re Malcolm D.* (1996) 42 Cal.App.4th 904, 909.) A notice of appeal is to be liberally construed in favor of its sufficiency. (Rule 8.405(a)(3); *In re Daniel Z.* (1992) 10 Cal.App.4th 1009, 1017.) Rule 8.405(a)(3) provides: "The notice of appeal must be liberally construed, and is sufficient if it identifies the particular judgment or order being appealed." (See *D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 361.)

While ordinarily a notice of appeal will not be considered adequate if it completely omits any reference to an order being appealed (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 418), we will liberally construe a notice of appeal to include an omitted order when the appeal would be timely as to that order. (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450–1451 [liberally construing a parent's notice of appeal from an order terminating parental rights to encompass the earlier denial of the parent's section 388 petition where the notice of appeal was filed within 60 days of the denial].)

Here, although mother did not refer to the denial of uncle's request for relative placement in her notice of appeal, the notice specified that she was appealing the "findings and orders" of May 1, 2025, which included the order denying uncle's placement request. Because the orders denying relative placement and appointing a guardian were made on the same date at the same hearing, and the denial of relative placement was a precondition to the guardianship order, we liberally construe the notice of appeal to include the denial of uncle's placement request. (*In re Madison W.*, *supra*, 141 Cal.App.4th at p. 1449; *In re J.F.* (2019) 39 Cal.App.5th 70, 77–79 & fn. 4 [disagreeing with *Madison W.*'s broad rule but stating that liberal construction is

---

[8] All rule references are to the California Rules of Court.

appropriate where orders were issued simultaneously, and it was reasonably clear the parent intended to appeal from both orders].)  Accordingly, we construe mother's notice of appeal as being from the appealable orders entered on May 1, 2025, to include the order denying relative placement.  (*In re Daniel Z.*, *supra*, 10 Cal.App.4th at p. 1017.)

### B.    Standing

The department contends mother lacks standing to raise the relative placement issue where her reunification services had been terminated, and she was not aggrieved by the juvenile court's order.  (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1035 (*Cesar V.*); *In re A.K.* (2017) 12 Cal.App.5th 492, 499; *In re K.C.* (2011) 52 Cal.4th 231, 236.)  We agree.

"Not every party has standing to appeal every appealable order.  Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.]  An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.*, *supra,* 52 Cal.4th at p. 236.)  "Accordingly, it has been held that a parent generally does not have standing to raise placement issues on appeal where the parent's reunification services have been terminated.  This is because decisions concerning placement of the child do not affect the parent's interest in reunification when the parent is no longer able to reunify with the child." (*In re J.Y.* (2018) 30 Cal.App.5th 712, 717.)  While there are exceptions to this general rule "when the placement may affect the decision whether to terminate parental rights (see *In re H.G.* (2006) 146 Cal.App.4th 1; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042), such is not the case here." (*In re J.Y.*, at p. 718.)

Here, mother was never provided with reunification services as they were bypassed at the June 13, 2024 disposition hearing.  Thus, while mother's parental rights

have not been terminated, son's placement in this case does not affect mother's interest in reunification. Moreover, his placement did not have the potential to alter the juvenile court's determination regarding the appropriate permanent plan or otherwise affect mother's interest in her legal status with respect to son because there was no question that guardianship was the appropriate plan, whether with the caregiver or uncle. (See *In re J.Y.*, *supra*, 30 Cal.App.5th at p. 718 [parent who retained parental rights over her child did not have standing to challenge her child's change in placement where her reunification services were terminated long before the placement decision and tribal customary adoption had been selected as the permanent plan].)

For this reason, this case is distinguishable from those that mother relies on, *In re H.G.*, *supra*, 146 Cal.App.4th 1 and *In re Esperanza C.*, *supra*, 165 Cal.App.4th 1042. As our Supreme Court explained, in both cases the appellate courts "concluded that parents whose rights had been terminated were aggrieved by, and thus *did* have standing to appeal, pretermination orders concerning their children's placement, because the possibility existed that reversing those orders might lead the juvenile court not to terminate parental rights." (*In re K.C.*, *supra*, 52 Cal.4th at p. 237.) From these cases, the Supreme Court derived the rule that a parent's appeal from a judgment terminating parental rights confers standing to appeal a placement order "only if the placement order's reversal advances the parent's argument against terminating parental rights." (*Id.* at p. 238.)

Here, mother offers no argument that the juvenile court's order affected any of her legal rights. Mother's parental rights have not been terminated, and she does not assert that placement with uncle would lead to a permanent plan other than guardianship. Mother argues she preserved her right to contest the denial of placement with uncle because at both the disposition and relative placement hearings she requested that son be placed with him under a guardianship and the juvenile court was obligated to consider her

wishes under section 361.3, subdivision (a)(2).[9]  Comparing her case to *In re H.G.*,

*supra*, 146 Cal.App.4th 1, mother asserts she has standing because she retains a

"fundamental interest in [son]'s companionship, custody, management and care." (*In re*

*H.G.*, at p. 9.)

While mother correctly states that she maintains an interest in son because her

parental rights have not been terminated, she does not explain how she is aggrieved by

the juvenile court's order. (*In re K.C.*, *supra*, 52 Cal.4th at p. 236; *In re D.S.* (2007)

156 Cal.App.4th 671, 674 [to have standing, "appellant must show *how* the denial of a

modification petition filed by the mother … affected his interests"].) As we have stated,

this is not a case like *In re H.G.*, where the parent had standing to challenge the

placement decision because reversing that decision might lead the juvenile court not to

terminate parental rights. (*In re K.C.*, *supra*, 52 Cal.4th at p. 237.)[10]

Mother asserts that in a case she contends is like the instant one, *In re N.J.* (2024)

104 Cal.App.5th 96, the appellate court did not question the parent's standing to appeal a

relative placement order. But that case did not address the issue of standing, and cases

---

[9]      Section 361.3, subdivision (a) provides that when a child is removed from a
parent's physical custody, preferential consideration shall be given to a relative's request
for placement, and in determining whether such placement is appropriate, the social
worker and court shall consider a list of factors. One of those factors is "[t]he wishes of
the parent, the relative, and the child, if appropriate." (§ 361.3, subd. (a)(2).)

[10]      In *In re H.G.*, the appellate court concluded that the parents, whose parental rights
had not been terminated, had a legally cognizable interest in their child's placement with
relatives because they retained a fundamental interest in their child's companionship,
custody, management, and care, which principle was reflected in the juvenile court's
obligation to consider the parent's wishes when determining whether relative placement
was appropriate. (*In re H.G.*, *supra*, 146 Cal.App.4th at pp. 9–10.) The appellate court
held this interest was injuriously affected because the placement decision could alter the
court's determination of the child's best interests and the appropriate permanent plan and
thereby affect the parents' interest in their legal status with respect to the child. (*Id.* at
p. 10.) In contrast here, mother concedes the appropriate permanent plan is the one the
juvenile court ordered, i.e., guardianship, because son is arguably not adoptable.

are not authority for propositions not considered. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 502, fn. 1.) Moreover, because the parent in *In re N.J.* appealed from an order terminating parental rights (*In re N.J.*, at p. 114), the case arguably fell under the exception articulated in *In re K.C.* that confers standing when reversal of the placement order would advance the parent's argument against termination of parental rights. (*In re K.C.*, *supra*, 52 Cal.4th at p. 238.)

Because mother has not established her legal rights or interests have been injuriously affected by the order denying uncle's request for placement, she lacks standing to contest the order on appeal.

## II.    ICWA Inquiry

Mother contends the juvenile court's section 366.26 orders must be reversed and the matter remanded because its finding ICWA did not apply was not supported by substantial evidence. Specifically, mother contends the department failed to comply with its initial ICWA inquiry duties because it did not ask paternal grandfather whether son had Indian ancestry. We agree the department failed to comply with the initial duty of inquiry and that limited remand is necessary.

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8.) The Indian child, Indian custodian, and the Indian child's tribe have the right to intervene in any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child" (25 U.S.C. § 1911(c)), and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. § 1914; see § 224, subd. (e)).

For purposes of ICWA, an "Indian child" is an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

The department's initial duty of inquiry to determine whether a child is an Indian child, includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) The juvenile court must ask the participants in a dependency proceeding upon each party's first appearance "whether the child is, or may be, an Indian child, whether they know or have reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and "[o]rder the parent … to complete Parental Notification of Indian Status ([California Judicial Council] form ICWA-020)." (Rule 5.481(a)(2)(C), italics omitted). The parties are instructed to inform the court "if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a) (2020); see § 224.2, subd. (c).)

Here, the evidence showed that mother stated at the outset of the case when asked about whether father had Indian heritage that she did not know anything about father's family because he was adopted. The department searched numerous databases for paternal relatives but the only living relative it could locate was paternal grandfather. The social worker mailed a letter and pamphlets to paternal grandfather, which also were sent to maternal relatives, which apparently addressed relative placement, but since a copy of the letter and pamphlets are not in the record, it is unknown whether they also asked about Indian heritage. In the social study prepared for the November 20, 2024 section 366.26 hearing, the department reported it did not know enough information

20.

about father to locate and contact paternal relatives, and while the department attempted to contact paternal grandfather, he did not respond. At that time, the social worker asked the family finding unit to contact maternal relatives regarding ICWA, but did not ask the unit to contact paternal grandfather. The department later reported that the maternal relatives who were called denied Indian ancestry, while maternal grandmother reported ancestry from outside the United States. Based on this evidence, the juvenile court found that there was no reason to know son was an Indian child.[11]

The department contends it made a meaningful effort to locate and interview son's extended relatives. There is no evidence in the record, however, that paternal grandfather was ever asked about possible Indian ancestry. The department recognizes the only contact was the letter sent to paternal grandfather in February 2024, but there is no evidence that the letter asked about Indian ancestry.[12] Because there is no evidence the department asked paternal grandfather about whether son was possibly an Indian child, as required by section 224.2, subdivision (b), the juvenile court's finding ICWA did not apply was not supported by substantial evidence.

The department argues inquiry of paternal grandfather was not required because father was an alleged father since there was no finding he was the presumed or biological father of son. The department asserts that as an alleged father, father cannot satisfy the definition of parent under ICWA since, "[u]ntil biological paternity is established, an alleged father's claims of Indian heritage do not trigger any ICWA notice requirement

---

[11]    Mother does not challenge the adequacy of the inquiry of maternal relatives into son's possible Indian ancestry.

[12]    We note that ICWA may apply even though father was adopted. (*In re B.R.* (2009) 176 Cal.App.4th 773, 785 [minors may meet definition of an Indian child where minors are biologically related to their father and father was potentially a member of an Apache tribe via his adoptive relationship with the minors' grandfather].)

because, absent a biological connection, the child cannot claim Indian heritage through the alleged father," citing *In re E.G.* (2009) 170 Cal.App.4th 1530, 1533 (*E.G.*).

We are not persuaded by the department's argument as the case it relies on, *E.G.*, is inapposite. There, one of two alleged fathers claimed Indian ancestry, but the agency did not send ICWA notice to the tribes from which the alleged father claimed he was descended. (*E.G.*, *supra*, 170 Cal.App.4th at p. 1532.) The alleged father was excluded as the minor's biological father after the court ordered both alleged fathers to participate in paternity testing. (*Ibid.*) The appellate court found no error in failing to provide ICWA notice to the identified tribes because ICWA defines an Indian child as one who has a biological tie to a tribe, and the alleged father was excluded as the biological parent. (*E.G.*, at p. 1533.)

In contrast here, father was never excluded as the biological parent. Rather, mother claimed he was the biological father and asserted there were no other possible fathers. The department appeared to recognize her claim of biological paternity when it identified father as a biological father. Since father was deceased, he could not seek to establish his biological connection or presumed father status.

We note "[t]he purpose of ICWA and related California statutes is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child, and whether the tribe wishes to intervene in the proceedings." (*In re N.G.* (2018) 27 Cal.App.5th 474, 484.) We also note the California Supreme Court has emphasized it is preferable to err on the side of examining thoroughly whether a minor may be an Indian child. (See *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 15.)

As such, we decline to hold that just because the court had not established father's status, we should disregard evidence on the record that father had a biological relationship with son. A limited remand is necessary for the court and department to adequately inquire into whether son is an Indian child.

## **DISPOSITION**

The orders appointing a legal guardianship and terminating dependency jurisdiction are conditionally reversed. The matter is remanded to the juvenile court with instructions to order the department to make reasonable efforts to interview paternal grandfather about the possibility of son's Indian ancestry and to report to the court the results of those efforts. Nothing in this disposition precludes the court from ordering additional inquiry of others having an interest in the child. Based on the information reported, if the court determines that ICWA does not apply, the court shall reinstate the orders appointing a legal guardian and terminating dependency jurisdiction. If further inquiry (§ 224.2, subd. (e)) or notice to any identified tribes (25 U.S.C. § 1912(a); § 224.3) is warranted, the court shall make all necessary orders to ensure compliance with ICWA and related California law.

DESANTOS, J.

WE CONCUR:

PEÑA, Acting P. J.

MEEHAN, J.